**Mark BARRY, M.D., Plaintiff,**

v.

**MEDTRONIC, INC., Defendant.**

**CIVIL ACTION No. 1:14–cv–104**

United States District Court,
E.D. Texas, Beaumont Division.

Signed 04/20/2017

108

Sean P. DeBruine, Dan Johnson Law Group, San Francisco, CA, Dario Alexander Machleidt, Kilpatrick Townsend & Stockton LLP, Seattle, WA, David Clay Holloway, Kilpatrick Townsend & Stockton LLP, Atlanta, GA, Erwin Lee Cena, Kilpatrick Stockton LLP, San Diego, CA, Laura Kathryn Mullendore, Kilpatrick Townsend & Stockton LLP, Denver, CO for Plaintiff.

Scott J. Bornstein, Julie P Bookbinder, pro hac vice, Zahra Alexis Smith, Richard Charles Pettus, Cassandra A. Adams, Allan A. Kassenoff John Edward Handy, Greenberg Traurig, LLP, New York, NY, Mary–Olga Lovett, Aimee Marie Housinger, Greenberg Traurig LLP, Houston, TX, Clyde Moody Siebman, Siebman Burg Phillips & Smith LLP, Sherman, TX, Elizabeth Siebman Forrest, Siebman, Burg, Phillips & Smith LLP, Plano, TX, Eric Fletcher, Wilmer Cutler Pickering Hale & Dorr, Boston, MA, for Defendant.

## ORDER GRANTING IN PART MOTION FOR ENHANCED DAMAGES AND DENYING MOTION FOR ATTORNEY'S FEES

Ron Clark, United States District Judge

Plaintiff Dr. Mark A. Barry brought suit, asserting that Defendant Medtronic, Inc. indirectly infringed two patents,[1] U.S. Patent No. 7,670,358 ("the '358 Patent") and U.S. Patent No. 8,361,121 ("the '121 Patent"), which relate to a system and method of aligning spinal vertebrae to correct common spinal deformities like scoliosis. After a six-day jury trial, the jury returned a verdict, finding in favor of Dr. Barry on every issue, including indirect infringement, various theories of invalidity, and willfulness, and awarded Dr. Barry $20,346,390. Dkt. 411 (Jury Verdict).

The court subsequently granted Medtronic's motion for judgment as a matter of law on one issue, finding no substantial evidence to support the jury's determination on overseas indirect infringement and the corresponding jury award. Dkt. 442 at 20–22.[2] This reduced the total damages

1. The court granted a joint motion to dismiss with prejudice all causes of action regarding the third previously-asserted patent, U.S. Patent No. 7,776,072. Dkt. 102.

2. Also as part of its post-trial rulings, the

award by $2,625,210, bringing the current total damages award to $17,721,180. The court denied Medtronic's motions for judgment as a matter of law on all other issues.

Dr. Barry moves for enhanced damages under 35 U.S.C. § 284 and attorney's fees under 35 U.S.C. § 285. Dkt. 431. Medtronic opposes both motions. Dkt. 437.

The court concludes that an enhancement of 20% of the total final damages award is merited. But because the court finds this case is not "exceptional" pursuant to 35 U.S.C. § 285, Dr. Barry's motion for attorney's fees is denied. Each issue is addressed in turn below.

## I. ENHANCED DAMAGES

### A. Legal Framework

██ Section 284 of the Patent Act states that a court "may increase the damages up to three times the amount found or assessed" when actual damages are awarded for infringement. 35 U.S.C. § 284. It is up to a district court to decide whether to increase damages, and if so, by how much. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, —— U.S. ——, 136 S.Ct. 1923, 1935–36, 195 L.Ed.2d 278 (2016). The type of conduct justifying enhancement was described by the Supreme Court as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* at 1932.

In this case, the jury was carefully instructed on willfulness and on Dr. Barry's burden of proof. Dkt. 414 at 19–20. The jury was instructed that it must find "wanton disregard for Dr. Barry's patent rights" or that infringement "is in bad faith, deliberate, or flagrant." The jury was given a list of factors to consider. Medtronic did not object to the instruction. Med-

court issued Findings and Conclusions regarding Medtronic's inequitable conduct allegations in which it denied the defense and

tronic asserted there was no substantial evidence to support the jury's finding and moved for judgment as a matter of law, but the court disagreed and denied Medtronic's motion.

██ The jury's finding of willfulness is a sufficient predicate under *Halo* to raise the issue of enhanced damages. *Halo*, 136 S.Ct. at 1934. However, a finding of willfulness does not *require* that a district court enhance damages. *Id.* at 1933. The court must take "into account the particular circumstances of each case" and assiduously consider whether "the egregiousness of the defendant's conduct based on all the facts and circumstances" warrants enhancement. *See id.* at 1933; *see also Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826–27 (Fed. Cir. 1992). Enhanced damages are not to be meted out in typical "garden-variety" patent suits, and instead, should be reserved for truly "egregious cases." *Halo*, 136 S.Ct. at 1932, 1934–35. Just as the decision of whether to enhance damages under Section 284 is committed to the sound discretion of the court, the amount of the enhancement—not to exceed treble damages—is also discretionary.

██ To guide the analysis, courts before and after *Halo* have relied on nine factors from *Read Corp. v. Portec, Inc.*, a 1992 Federal Circuit case. *See i4i Ltd. v. Microsoft, Inc.*, 598 F.3d 831, 859 (Fed. Cir. 2010) ("[T]he standard for deciding whether—and by how much—to enhance damages is set forth in *Read*."); *WBIP, LLC v. Kohler, Co.*, 829 F.3d 1317 (Fed. Cir. 2016) (approving a 50% enhancement based on analysis of *Read* factors); *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 203 F.Supp.3d 755, 758–59 (E.D. Tex.2016). Those factors are: (1) whether the infringer deliberately copied

dismissed the inequitable conduct counterclaim. Dkt. 443.

the ideas or design of another ("copying"), (2) whether "the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed," (3) the infringer's behavior as a party to the litigation, (4) the defendant's size and financial condition, (5) closeness of the case, (6) duration of defendant's misconduct, (7) remedial action taken by the defendant, (8) defendant's motivation for harm, and (9) whether defendant attempted to conceal its misconduct.[3] *Read*, 970 F.2d at 827–28. These factors provide "useful guideposts" in the court's exercise of discretion but are not binding or exhaustive. *Imperium*, 203 F.Supp.3d at 763–64; *see also Finjan v. Blue Coat Sys.*, Case No. 13-CV-0399-BLF, 2016 WL 3880774, at *16 (N.D. Cal. July 18, 2016). As one court stated, "[w]hile the *Read* factors remain helpful to the [c]ourt's execution of its discretion, an analysis focused on egregious infringement behavior is the touchstone for determining an award of enhanced damages rather than a more rigid, mechanical assessment." *Imperium*, 203 F.Supp.3d at 763. The parties do not dispute that the *Read* factors should guide the court's analysis of enhanced damages. Dkt. 431 (P's brief) at 6–7; Dkt. 437 (D's brief) at 7–8.

**B. The *Read* factors support enhancement of damages.**

**1. Factors weighing in favor of enhancement**

**a. Read *factor 1: Copying***

The evidence demonstrates that Medtronic was, at the very least, reckless as to whether it copied Dr. Barry's inventive method and system, which weighs in favor of enhancement. The copying inquiry

under *Read* focuses not on whether Medtronic copied Dr. Barry's patent but whether it copied "the ideas or design of another," regardless of when Dr. Barry's patents might have issued. *Read*, 970 F.2d at 827. "Slavish copying" of a commercial embodiment is not required. *See Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409, 1414 (Fed. Cir. 1996). "Smoking gun" evidence of copying is also not required; recklessness towards copying alone merits some enhancement. *See WBIP, LLC v. Kohler Co.*, Civ. Action No. 11-10374-NMG, 2014 WL 585854, at *7 (D. Mass. Feb. 12, 2014), *aff'd*, 829 F.3d 1317 (Fed. Cir. 2016) ("*WBIP* (Dist. Ct. Decision)").

**i. Evidence of deliberate or at least reckless copying.**

Dr. Lawrence Lenke was Medtronic's chief medical surgical consultant in Medtronic's efforts to develop a spine derotation system, which came to be known as the apical derotator project. Medtronic employees working on the project described Dr. Lenke as their "key point of contact" and stated that he was "an industry partner for [Medtronic]." Tr. at 1460:10–22; Tr. at 1502:15–1506:9. Mr. Johnson testified that the two of them had monthly calls and regularly met to discuss development, in particular the status reports about the project that were entitled "Lenke Status Reports." *Id.* Medtronic helped prepare and file the application for the patent underlying Medtronic's VCM system, which names Dr. Lenke as an inventor.

Dr. Lenke has been a paid consultant of Medtronic since 2001 (Stipulations in Joint PTO (Dkt. 386 at 13)) and earns approxi-

---

**3.** There is some overlap in the evidence presented to support enhancement and awarding attorney's fees under 35 U.S.C. § 285. This overlap and how it affects the legal analysis is discussed in the section addressing the legal framework behind Section 285. *See infra* Section II.A.

mately $4 to $4.5 million per year from Medtronic in the form of royalties. Tr. at 1590. Separately, Medtronic pays Dr. Lenke an hourly amount for his work on product development under the formal contractual agreement between Medtronic and Dr. Lenke. Tr. at 1590:4–8; 1691:21–1690:4. Dr. Lenke testified that he had been trying since at least early 2001 to develop an appropriate method for spine derotation. Tr. at 1596–97 (testifying to start of work on apical derotator project in 2000 or early 2001); Tr. at 1685–86.

Dr. Lenke also helps market and promote Medtronic products for Medtronic, including the Legacy and Solera systems with the VCM kits, the accused products in this case. He traveled internationally to get feedback about the apical derotator concept and promoted Medtronic products abroad. *See, e.g.,* Tr. at 1475:14–1476:2. He was also paid $750 per hour for consultation through this case. *See* 1689:21–1690:4. He testified to having worked on, and personally designed, "dozens" of instruments or products for Medtronic, and that at any given time between 2001 and the present, he could be working on anywhere between ten and thirty projects for Medtronic. Tr. at 1689:10–14; Tr. at 1587:7–11. During trial, Medtronic made no efforts to separate itself from the work of Dr. Lenke or present him as an uninterested third party.

Based on these facts, the court finds that Dr. Lenke was Medtronic's agent regarding Medtronic's development and sale of the VCM spine derotation kit.

 Because Dr. Lenke was an agent of Medtronic, Dr. Lenke's actions can be imputed to Medtronic. General agency law governs this determination. *See Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1249 (Fed. Cir. 2007) (applying general agency law to determine whether knowledge is imputed to a corporation). Under general agency principles, the con-

duct of an agent in the position of Dr. Lenke can be imputed to a corporation in the position of Medtronic. *See* RESTATEMENT (THIRD) OF AGENCY § 5.03 (AM. LAW INST. 2005) ("notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal, unless the agent (a) acts adversely to the principal as stated in § 5.04, or (b) is subject to a duty to another not to disclose the fact to the principal.")

In patent law, as in any other field, courts frequently impute the actions of agents to corporations. *See Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1369 (Fed. Cir. 2013) ("Corporations act through their employees; the general rule is that an agent's knowledge is imputed to the principal when employees are acting within the scope of their authority or employment, absent special circumstances."); *Potter Voice Tech., LLC v. Apple, Inc.*, 24 F.Supp.3d 882, 886 (N.D. Cal. 2014) (in the context of willful infringement, "[t]o require that the corporation is aware of the asserted patent is to say that certain of the corporation's employees have knowledge of that patent.").

Turning to the questionable conduct of Dr. Lenke related to copying, the court heard extensive testimony about how Dr. Lenke was also chairman of an industry conference known as the International Meeting on Advanced Spine Techniques ("IMAST") (Tr. at 1595). In his role as IMAST chairman, Dr. Lenke helped review abstracts and group them together for the June 2004 IMAST meeting. Tr. at 1703–04; Tr. at 200:8–16. In advance of the July 2004 meeting, Dr. Barry had submitted an abstract on February 1, 2004, outlining his now-patented method and system. Tr. at 197:10–200:6. Dr. Lenke testified that he and Dr. Barry spoke about his "scoliosis presentation" and that

Dr. Lenke had reviewed the before and after x-rays that Dr. Barry showed him regarding his latest work. Tr. at 1595:4–1596:10.

Sometime during or just before the 2004 IMAST Conference, Dr. Lenke notified Medtronic internally to prepare to file a patent application. DX 186 (Invention Disclosure dated July 1, 2004, signed by Dr. Lenke on September 8, 2004). For some reason, Dr. Lenke and Medtronic delayed and the application was filed more than a year after Dr. Barry's application. *See* '008 patent (DX 4); Tr. at 1698 (noting filing date of February 9, 2006). At trial, the jury learned that Dr. Lenke had "accidentally" listed Dr. Barry's patents on his own CV. Tr. at 1584– 85. This timeline calls into question Dr. Lenke's testimony that he was not "personally aware" of Dr. Barry's patents prior to Dr. Barry filing suit (Tr. at 1596); and it certainly damaged his credibility with the court, as it evidently did with the jury.

There is no evidence that anyone at Medtronic investigated the origins of Dr. Lenke's work once Dr. Lenke submitted the internal paperwork for a patent, which supports a determination that Medtronic acted with recklessness towards copying Dr. Barry's work. While this might not rise to the level of egregiousness meriting treble damages (*see Imperium*, 203 F.Supp.3d at 763–64), it certainly indicates that there was disregard for Dr. Barry's rights during the development of Medtronic's VCM kit. Medtronic cannot distance itself from Dr. Lenke with a "Sergeant Schultz—we know nothing" defense. Medtronic argues that Dr. Lenke independently developed a similar idea, but the fact that Dr. Lenke sought a patent at about the same time as Dr. Barry's presentation at the July 2004 conference cannot be ignored.

Contrary to Medtronic's argument, Medtronic's conduct before the patents issued can be, and is, probative of copying under *Read. WBIP* (Dist. Ct. Decision), 2014 WL 585854, at *7. *Read* specifically refers to copying "the ideas or design of another" and states in a footnote that this "would encompass, for example, copying the commercial embodiment, *not merely the elements of a patent claim.*" *Read*, 970 F.2d at 827 n.7 (emphasis added). A patent need not have issued before the ideas of that inventor can be copied in bad faith. Therefore, evidence tending to prove that Dr. Lenke copied Dr. Barry's mere ideas, as they were presented at the IMAST conference, weighs in favor of enhancement, regardless of what the status was of Dr. Barry's patents.

And regardless of whether Dr. Lenke was proven to have believed he was copying Dr. Barry's ideas when he notified Medtronic to prepare the application, the similarity of the patents had to be evident when Dr. Barry's first patent issued. There are a few differences between Dr. Barry's patent and the Lenke application that was still pending (which ultimately led to the '008 patent), such as the exact placement of the handles, but they are minor and almost cosmetic. The evidence that Medtronic continued selling VCM kits after Dr. Barry's patents were issued without investigating Dr. Barry's patents once it became aware of them buttresses the court's conclusion that *Read* factor 2, discussed below, favors enhancement.

Despite Medtronic's contention to the contrary (Dkt. 437 at 8),[4] Dr. Barry's failure to plead or allege copying does not

4. Medtronic contends in its briefing that "Dr. Barry does not seriously contend that Medtronic actually copied his evidence," because Dr. Barry never alleged copying despite evidence that he was aware of Dr. Lenke in the early 2000s (Tr. at 347:20–348:9) and aware that the VCM kit started being distributed by 2006 (Tr. at 318:14–25).

preclude this court from considering whether the evidence demonstrates deliberate copying or recklessness towards copying for the purpose of enhancement. The question before this court is what the evidence demonstrates with regards to copying—not why Dr. Barry did not allege copying.

On balance, the copying analysis supports enhancement.

b. **Read** *factor 2: Medtronic's investigation of the scope of the patent and formation of a good-faith belief that it was invalid and not infringed*

There was no evidence that Medtronic investigated the scope of either patent-in-suit prior to trial, let alone at the time it learned about the patents. This factor favors enhancement.

As the court previously outlined in its JMOL order, substantial evidence demonstrates that Medtronic was aware of the patents prior to this lawsuit.[5] Because the court's prior Order discusses the evidence in detail, it is only summarized here. Mr. Ballard, a Medtronic witness, conceded that he had been aware of Dr. Barry's '358 Patent since February 2013, prior to the lawsuit. Tr. at 766. There was also substantial evidence that, as early as March 2010, Medtronic received but ignored a "MicroPatent Alert," which contained mention of and a copy of Dr. Barry's '358 Patent. Dkt. 442 at 19; *see also* PX 570, PX 610; PX 619; PX 619–A; PX 618; PX 620. Though Medtronic employees deny that Medtronic had knowledge because of this "alert" (*see* Tr. at 761:12–14; Tr. at 763 (Mr. Ballard testifying that there was no corporate awareness of a Barry patent based on the MicroPatent Alert)), the jury evidently discredited Medtronic's employees. There were May 2010 emails between Medtronic employees regarding Dr. Bar-

ry's discussions with Biomet regarding "VCM–like" IP. PX 618. There are also internal Medtronic emails from as early as April 2007 that indicate that Medtronic had some knowledge of "Dr. Barry's IP" (albeit without specific mention of either patent or his applications). PX 613. Therefore, to the extent that Medtronic contests enhancement by denying knowledge of the patent, Medtronic's efforts fail.

Instead, when faced with evidence indicating pre-suit knowledge of the patents, Medtronic continued to deny such knowledge at trial. Medtronic, presumably in an effort to comport with this theory, did not present any testimony or documents indicating that it investigated the scope of the patents or made efforts to ensure that Medtronic was not infringing. Mr. Ballard explicitly testified that nothing was done in response to the alert. Tr. at 763:17–764:2.

There is also no evidence that Medtronic formed a good-faith belief that the patents were invalid prior to trial. There is no opinion of counsel letter—which is surprising, given the size and scope of Medtronic's intellectual property portfolio. Medtronic's briefing (*see* Dkt. 437 at 17) proves that it stands by the same theory it advanced at trial, that the MicroPatent Alerts did not put Medtronic on notice of either of the patents and the company's first awareness of a Barry patent was in February 2013. This theory implicitly concedes that it could not have investigated the patents and could not have formed a good-faith belief that the patents were invalid in response to the alert. *Id.*

 Medtronic states without support that it "possessed a good faith belief" that the patents were invalid based on its Section 102(g) and 102(b) invalidity theories, but conveniently ignores the timeframe at

---

5. Pre–suit knowledge of the patents-in-suit continues to be a requirement to enhance

damages even after *Halo*. *WBIP*, 829 F.3d at 1341.

which it possessed a good-faith belief. Dkt. 437 at 10. As *Halo* made clear, culpability is judged at the time of the infringing conduct, which began prior to this lawsuit. *Halo*, 136 S.Ct. at 1932. An after-the-fact robust invalidity presentation may be a defense to liability but cannot be conclusive in the willful infringement culpability inquiry. *See WBIP*, 829 F.3d at 1341. Medtronic presented no evidence that it had formed a good-faith belief regarding the patents' validity at the start of its infringement, or any time prior to this suit.

Because Medtronic admits that it did not investigate the scope of the patent and there is no evidence that it formed a good-faith belief that the patents were invalid prior to suit (in fact it continues to outright deny knowledge of the patent despite the 2010 alert), the court concludes that Medtronic was aware of the patents and, at the very least, reckless towards their infringement through development and distribution of the Legacy and Solara Systems with VCM kits.

This factor favors enhancement.

#### c. Read *factor 4: Medtronic's size and financial condition*

According to public financial statements, Medtronic earned $28.8 billion dollars in revenue and $3.5 billion in net earnings in fiscal year 2016. Medtronic 2016 Integrated Performance Report, *available at* http://www.medtronic.com/content/dam/ medtronic-com/us-en/corporate/documents; PX 359 (2015 Annual Report). In fiscal year 2016, Medtronic employed over 88,000 people and operated out of approximately 480 locations in approximately 160 countries. *Id.* The company's 2014 10–K reports $17.005 billion in annual revenue for fiscal year 2014, which was an increase from $15.392 billion for fiscal year 2010. Medtronic Inc., Annual Report (Form 10–K), at 1 (June 20, 2014), *available at* https://www. sec.gov/edgar/searchedgar/companysearch. html. Though this evidence was not pre-sented and admitted at trial, Medtronic cannot and did not contest this factor. Dkt. 437.

This factor weighs in favor of enhancement.

#### d. Read *factor 7: Medtronic's failure to take remedial action*

There was no evidence that Medtronic took remedial action upon learning about its potential infringement of Dr. Barry's patents. Though testimony indicated that Medtronic no longer relies on or heavily markets the VCM kit to be used with the Legacy and Solara Systems, there was no evidence establishing that Medtronic discontinued distribution or otherwise curbed use of potentially infringing devices as a remedial measure or in response to that potential (now proven) infringement. The mere fact that Medtronic is developing new products to replace the accused VCM kit does not establish Medtronic sought to remedy its infringement. Medtronic likely pursued alternative new product(s) for commercial reasons. This is especially likely given that no doctor who took the stand testified to using the VCM kit regularly. Dr. Yassir testified that he does not use the VCM kit but uses the DePuy Expedium System, a completely different system not owned by any party to the case. Tr. at 936:21–937:4. Dr. Lenke testified that he no longer uses the VCM kit in the manner described in the manual he himself prepared, where the derotators are linked across the spine, because there has been an "evolution" in the technique of linking devices and he has "gotten away from doing this particular type of instrument assembly." Tr. at 1709:5–1711:8.

This factor weighs in favor of enhancement.

#### e. Read *factor 8: Medtronic's motivation for harm*

Neither party addressed this factor in briefing. The court, however, recalls no

evidence that Medtronic was motivated to infringe or continue infringing for any reason other than its own commercial business interest. Because there is no evidence establishing a separate motivation for harm, but also in light of the fact that neither party addressed this factor, this factor is neutral.

### 2. Factors weighing against enhancement

#### a. Read *factor 3: Medtronic's behavior as a party to the litigation*

Medtronic's litigation tactics, while vigorously employed and at times not well received, by the jury or the court, did not cross the line from zealous advocacy into gamesmanship. Dr. Barry alleges various instances of alleged gamesmanship: he accuses Medtronic of violating court orders, engaging in misconduct in preparing demonstratives for trial, coaching trial witnesses to falsely testify, concealing relevant evidence regarding Smartlink (a related, non-accused product) and surgeons' training, and falsifying discovery responses. Dkt. 431 at 5–19. The evidence and this court's experience with both parties, however, does not suggest that Medtronic's conduct represents the type of egregiousness that justifies enhancement. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, Case No. 09-cv-05235-MMC, 2017 WL 130236, at \*4 (N.D. Cal. Jan. 13, 2017) ("[H]aving reviewed the asserted misconduct on which [the patentee] relies, [the court] finds 'this was a hard fought case but did not cross the line into improper conduct.'") (quoting *Finjan*, 2016 WL 3880774, at \*16); *but see Imperium*, 203 F.Supp.3d at 763–64 (trebling damages where the court found that Defendants "made multiple misrepresentations under oath" in their sworn interrogatories, gave false testimony to the jury on key topics, and failed to produce

key documents—despite repeated requests for them—until the fourth day of trial).

Dr. Barry points to attempts by Medtronic that could have reached the point of "egregiousness" but objections to these were sustained. For instance, Dr. Marco's attempt to go outside of the court's construction of "mechanically linked" was excluded, leaving him with little to opine about on infringement. With regards to Dr. Barry's accusations against Dr. O'Brien, Medtronic's invalidity expert, Medtronic actually agrees that the contested testimony, specifically that Dr. Lenke reduced to practice prior to February 2008, violated a prior court order. Dkt. 437 at 13. But after a sidebar, the jury was instructed to disregard that testimony, in other words, ignore an expert's conclusion. These corrective measures were intended to provide the proper evidence to the jury, and by implicitly discrediting Medtronic's key expert witnesses, likely already penalized Medtronic. The same is true concerning Dr. Barry's allegation that Medtronic concealed documents regarding Medtronic's knowledge of the patents and claims of witness coaching (*see* Dkt. 431 at 13)—the key documents were ultimately produced and effectively used against Medtronic at trial, especially in establishing willfulness.

In regards to other accusations, the court is not convinced that Medtronic unduly crossed a line, if it crossed a line at all. For instance, Dr. Barry's accusation that Medtronic "concealed" evidence of Smartlink products, which Dr. Barry never claimed were accused products in this case and which were substantively excluded from the case, cannot justify enhancement.

Enhancement analysis is not an opportunity for this court to penalize a zealous trial team that engaged in hard-fought battles but ultimately lost the war. Neither party here refrained from delivering hard blows or from attempts to hide the ball.[6]

---

6. As the parties recall, the court was forced to

disqualify Dr. Barry's prior counsel in this

118

Objections and curative instructions to the jury are part of the Federal rules. It has not been made clear to the court why Medtronic deserves to be further penalized when these ameliorative procedures were employed. The actions of both sides at times may have approached those of a privateer, but they did not sink to the level of a "pirate." *See Halo*, 136 S.Ct. at 1932.

This factor, although a closer call, does not support enhancement.

**b. Read *factor 5: Closeness of the case***

Medtronic introduced invalidity theories that were not groundless. Even after *Halo*, the reasonableness of an infringer's invalidity position at trial may be relevant. *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1363 (Fed. Cir. 2016) ("After *Halo*, the objective reasonableness of the accused infringer's positions can still be relevant for the district court to consider when exercising its discretion."). An infringer's reasonableness may be evidenced by the Court's prior rulings or by the fact that validity was a "hotly-contested issue" throughout a case. *See, e.g., Greatbatch Ltd. v. AVX Corp.*, C.A. No. 13-723-LPS, 2016 WL 7217625, at *4 (D. Del. Dec. 13, 2016). Here, Medtronic's dueling inventor theory was a "hotly-contested" issue. The court's prior Order denying Medtronic's motion for summary judgment based on invalidity under Section 102(g) (Dkt. 329) underscores this. Aside from this Section 102(g) prior inventor defense, Medtronic asserted several other grounds of invalidity that were not objectively unreasonable, including prior use and prior sale theories under Section 102(b). In the end, Dr. Barry's victory rested on credibil-

ity determinations, not on a finding that Medtronic's theories were frivolous.

The closeness of the case weighs against enhancement.

**c. Read *factor 6: Duration of Medtronic's infringement***

Dr. Barry dedicated a pithy paragraph to this factor, stating that infringement went on from March 2010, when Medtronic received the Micro Patent Alert, and continued "after 2013," when Medtronic admitted that it became aware of both patents-in-suit. Dkt. 431 at 22–23. Dr. Barry also recycled his complaints that Medtronic engaged in "hard ball" litigation and concealment in discussing this factor, but those issues are addressed in the court's analysis of other factors. *Id.* at 23.

Because there is no evidence that the duration of Medtronic's infringement takes this case from a "garden variety" infringement case to one of egregiousness, this factor does not support enhancement.

**d. Read *factor 9: Medtronic's concealment of misconduct***

Again, neither party fully briefed this factor. There is no evidence that Medtronic took steps to conceal its infringement, certainly none that has not otherwise been taken into account in the court's analysis. Dr. Barry does not proffer any such evidence in briefing, either.

This factor weighs against enhancement.

**C. Enhancement**

*Read* factors 1 (copying), 2 (Medtronic's pre-suit investigation of patent scope), 4 (Medtronic's size and financial condition), and 7 (Medtronic's failure to take remedial

case. *See* Dkt. 73 (Order granting in part motion to disqualify the Gray Reed Law Firm). Dr. Barry initially sought to be represented by Mr. Henry, his patent lawyer, even though Mr. Henry was also going to be a key witness in the case. Dr. Barry initially repre-

sented that Mr. Henry was only involved "at the outset" in prosecution, but as the record developed, it became clear that his participation was to such an extent as to require disqualification.

action) support enhancement. The others do not. Considering the level of egregiousness presented by Medtronic's actions and inactions in this case, an enhancement of 20 percent on the final damages award is merited.

▮ Enhancing but not trebling damages based on a lesser degree of egregiousness is well supported by precedent. *See WBIP*, 829 F.3d at 1342 (approving an enhancement of 50% based on analysis under *Read* factors); *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 867 (Fed. Cir. 1997) (affirming 10% enhancement based on application of *Read* factors); *see also Wright v. E–Systems, LLC*, Civil No. 3:12-cv-4714-K-BK, 2016 WL 7802996, at *5 (N.D. Tex. Dec. 20, 2016) (citing cases in which damages were less than trebled because the infringer's conduct was improper with respect to only certain *Read* factors). "The degree of enhancement should be proportional to the degree of the willful infringer's culpability .... A less significant enhancement may be appropriate for less egregious (though still culpable) conduct." Final Judgment (Dkt. # 47), *Core Wireless Licensing S.a.r.l. v. LG Elecs., Inc.*, Case No. 2:14–cv–912, slip op. at 1 (E.D. Tex. Nov. 2, 2016) (finding that plaintiff was entitled to enhanced damages towards the "lower end of that spectrum" and awarding a 20% enhancement).

Based on the totality of the circumstances and the court's application of the *Read* factors above, the court finds that an enhancement on the lower end is merited here. This case does not rise to the level of egregiousness that merits treble damages or even a 50% enhancement. *See, e.g., Bos. Sci. Corp. v. Cordis Corp.*, 838 F.Supp.2d 259, 280–81 (D. Del. 2012) (doubling damages where defendant infringer was aware of patent, its litigation conduct was somewhat troublesome, the case was not close, and the defendant was motivated to harm the patent owner, but where there was no copying and there was no allegation that defendant attempted to conceal its conduct); *Wright*, 2016 WL 7802996, at *5 (enhancing damages by 50% where the defendant infringer did take some measures to investigate the scope of the patents-in-suit, but admitted to willfulness, deliberately copied plaintiff's patented devices, was found to have been motivated to harm plaintiff, and refused to participate in the lawsuit for years); *but see Va. Panel*, 133 F.3d at 867 (affirming 10% enhancement where patent copying was recklessly indifferent as opposed to deliberate, the defendant conducted some investigation of the patents but also engaged in "unacceptable litigation behavior").

The court finds that an enhancement of **20 percent** of the final total damages award is merited.

## II. ATTORNEY'S FEES

Dr. Barry seeks a finding that this case is exceptional and an award of attorney's fees in the amount of $5,532,762, pursuant to 35 U.S.C. § 285. The court finds that this case is not exceptional and denies Dr. Barry's motion for attorney's fees.

### A. Legal Framework

▮ "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "[A]n exceptional case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness*, — U.S. —, 134 S.Ct. 1749, 1756, 188 L.Ed.2d 816 (2014). "Factors that a court may consider include frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the cases) and the need in

particular circumstances to advance considerations of compensation and deterrence." *Arthrex, Inc. v. Smith & Nephew, Inc.*, Case No. 2:15-cv-01047-RSP, 2017 WL 365239, at *1 (E.D. Tex. Jan. 25, 2017) (citing *Octane*, 134 S.Ct. at 1756 n.6). Litigants must establish their entitlement by a preponderance of the evidence. *Octane*, 134 S.Ct. at 1758.

 The determination is to be made on a case-by-case basis, considering the totality of the circumstances. *Id.* at 1756. "[T]here is no precise rule or formula for making these determinations, but instead equitable discretion should be exercised in light of the considerations." *Id.* at 1756. The determination falls squarely within the discretion of the court. *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, —— U.S. ——, 134 S.Ct. 1744, 1756, 188 L.Ed.2d 829 (2014); *see also Eon–Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324 (Fed. Cir. 2011) ("[W]e are mindful that the district court has lived with the case and the lawyers for an extended period."). A willfulness finding does not necessarily make a case exceptional. *See Stryker Corp. v. Zimmer, Inc.*, 837 F.3d 1268, 1279 (Fed. Cir. 2016) (affirming jury's willfulness finding but remanding for lower court's consideration of attorney's fees, reasoning that "it does not necessarily follow that the case is exceptional" from a willfulness determination).[7] As our sister court once stated, "[a] finding of exceptionality is something that this [c]ourt arrives

at reluctantly, lest we unintentionally narrow the public's access to the courts by chilling future decisions to seek redress for a case in which success is not guaranteed." *Edekka LLC v. 3balls.com, Inc.*, No. 2:15-CV-541 JRG, 2015 WL 9225038, at *5 (E.D. Tex. Dec. 17, 2015).

The court recognizes that, when the infringer loses, the conduct of the infringer or its counsel may inform both the enhanced damages and exceptionality inquiries. For instance, the infringer's behavior as a party to the litigation (one of the *Read* factors) squarely overlaps with the type of conduct the court should consider for exceptionality. *See Octane*, 134 S.Ct. at 1756 n.6. Several older pre–*Halo* Federal Circuit cases recognize the interplay. *See, e.g., Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1569–73 (Fed. Cir. 1996). The Court in *Jurgens* stated the following:

> [A]ttorneys fees under section 285 may be justified by any valid basis for awarding increased damages under section 284. However, conduct which a court may deem 'exceptional' and a basis for awarding attorneys fees may not qualify for an award of increased damages.

*Jurgens*, 80 F.3d at 1573 (citation omitted). One way of unpacking the interplay recognized in *Jurgens* and other cases could be to focus analysis of enhanced damages primarily on defendant's conduct related to the infringement, while consideration of attorney's fees could focus more on those

---

**7.** The court is aware that pre–*Halo* cases make clear that willfulness can support an exceptionality finding. *See, e.g., S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.*, 781 F.2d 198 (Fed. Cir. 1986). However, it is well established, both before and after *Halo*, that a willfulness finding by no means requires an award of fees. *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1573 (Fed. Cir. 1996) ("even where damages are increased under section 284, a court may decline to award attorney's fees under section 285."); *Stryker*, 837 F.3d

1268. The degree to which a willfulness finding colors the court's exceptionality analysis, like other aspects of the inquiry, is discretionary.

The court is also aware that *S.C. Johnson* made clear that it was "necessary for the trial court to explain why this is not an exceptional case in the face of its express finding of willful infringement." 781 F.2d at 201. But this requirement may have been relaxed. *See Transclean Corp v. Bridgewood Servs.*, 290 F.3d 1364, 1379 (Fed. Cir. 2002).

fees and costs necessarily imposed on the winner by the questionable litigation tactics of the losing party. *See S.C. Johnson,* 781 F.2d at 201 (discussing fees as a means to establish a "fair allocation of the burdens of litigation as between winner and loser"); *see also Jurgens,* 80 F.3d at 1570. The *Jurgens* court explained in some detail the basis for this distinction:

> Because increased damages are punitive, the requisite conduct for imposing them must include some degree of culpability ... The correlation between bad faith, willful infringement and increased damages, however, is sometimes misunderstood because the term 'bad faith' has numerous patent law applications. Only some of these are relevant in determining the predicate culpability for an increased damages award ....
>
> Bad faith, is used, for example, in referring to misconduct in the prosecution of or litigation over a patent. Such conduct includes inequitable conduct during patent prosecution, bringing vexatious or unjustified suits, attorney or client misconduct during litigation, or unnecessarily prolonging litigation. *These acts by themselves, however, are not sufficient for an increased damages award under section 284 because they are not related to an underlying act of infringement and say nothing about the culpability of the infringer.*

*Id.* at 1570 (emphasis added). The court stated in a footnote that "[c]ourts have tools to punish egregious misconduct. The listed actions [inequitable conduct, bringing vexatious or unjustified suits, attorney or client misconduct] are typical of 'exceptional case' conduct upon which an award of attorneys fees may be based under 35 U.S.C. § 285." *Id.* at 1570 n.3.

Dicta in *Halo* reminds us that the focus of the inquiries is different, since attorney's fees are intended to compensate a prevailing party, while enhanced damages punish an infringer:

> Some early decisions did suggest that enhanced damages might serve to compensate patentees as well as to punish infringers. Such statements, however, were not for the ages, in part because the merger of law and equity removed certain procedural obstacles to full compensation absent enhancement. In the main, moreover, the references to compensation concerned costs attendant to litigation. That concern dissipated with the enactment in 1952 of 35 U.S.C. § 285, which authorized district courts to award reasonable attorneys' fees to prevailing parties in "exceptional case" under the Patent Act. It is against this backdrop that Congress, in the 1952 codification of the Patent Act, enacted § 284.

*Halo,* 136 S.Ct. at 1930 (citations omitted). *Halo's* focus on culpability "at the time of the challenged conduct" for enhanced damages reiterates that enhanced damages are punitive damages awarded to penalize willful *infringement* versus general litigation misconduct. *See Halo,* 136 S.Ct. at 1933.

In considering the parties' conduct and analyzing it in light of the totality of the circumstances, the court keeps these distinctions in mind, especially since Dr. Barry relies on much of the same alleged conduct in asking for both an enhancement and fees. Viewing Medtronic's conduct through a lens that differentiates between the purposes of the two statutes ensures that Medtronic is not inadvertently penalized twice for the same "culpable" conduct.[8]

---

8. The court recognizes that in the proper case, it could find egregious conduct that included misbehavior as a party (*Read* factor 3) justified enhancement and that the same misbehavior would weigh in favor of a finding that the case is exceptional.

**B. This case is not "exceptional."**

 This was a close case and not one that was "exceptional" so as to justify an award of attorney's fees under Section 285. After carefully listening to the testimony and considering the evidence proffered during a seven-day jury and bench trial, this court finds that Medtronic's litigating positions were not uniformly weak or without merit. Medtronic's invalidity positions were not frivolous. Many key issues, for instance Medtronic's contention that its consultant Dr. Lawrence Lenke was the prior inventor of the patented method and system and Dr. Barry's assertion that a series of potentially-invalidating surgeries were experimental, were hard-fought. The parties went head-to-head and the determination ultimately turned on the jury's assessment of the evidence and the credibility of witnesses. "Even if a party's position is ultimately meritless, the question is whether it was 'so meritless as to stand out from the norm and, thus, be exceptional.'" *NexusCard, Inc. v. Brookshire Grocery Co.*, Case No. 2:15-cv-961-JRG, 2016 WL 6893704, at *3 (E.D. Tex. Nov. 23, 2016) (quoting *SFA Sys., LLC v. Newegg, Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015)). There was nothing about Medtronic's substantive positions that stood out from the norm.

To support his contention that this case is exceptional, Dr. Barry asserts that Medtronic's litigation conduct justifies a fee award. Dkt. 431 at 24–25. To support this assertion, Dr. Barry identifies the same alleged misconduct that underscores his motion for enhanced damages—for instance, alleged violations of court orders, Dr. O'Brien's testimony regarding court-excluded opinions, and allegedly false interrogatories about the VCM kits. Dkt. 431 at 24–25. Even the standard for "litigation misconduct" on which Dr. Barry relies, from *i4i Limited Partnership v. Microsoft* (Dkt. 431 at 24), concerned enhanced damages, not attorney's fees. Based on the court's experience with both parties throughout the two-year litigation, the court does not find Medtronic's conduct or its litigation strategies unreasonable. This undercuts a finding of exceptionality.

Dr. Barry also alleges that Medtronic's conduct outside the presence of the jury makes this case exceptional. Dkt. 431 at 25. Dr. Barry complains that Medtronic forced him to meet and confer "into the wee hours during trial," delayed in providing demonstratives, and proffered an unreasonable number of exhibits and demonstratives for use with witnesses. Dkt. 431 at 25. These allegations underscore how hard-fought this trial was but do not muster up evidence of exceptionality. After all, Dr. Barry listed over 700 exhibits on his initial exhibit list. Dkt. 416.

In considering the totality of the circumstances in a Section 285 analysis, the court can consider the conduct of the movant, in this case Dr. Barry. *See Gaymar Indus., Inc. v. Cincinnati Sub–Zero Prod., Inc.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015); *see also Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1415 (Fed. Cir. 2004) (affirming denial of fees where district court "credited each of the parties with some share of the bad behavior" and reasoned that an award would "tend to reward other wrongdoers."). Considering both parties' conduct, it is not evident, even by a preponderance of the evidence, that Medtronic was the only party that delivered hard blows or that Dr. Barry was unfairly prejudiced. Where, as here, both sides had experienced counsel and tough litigation appears to have been the modus operandi for both sides, the court cannot find the case to be exceptional.

Having found that this case is not exceptional, the court need not reach the subsequent questions of whether attorney's fees are warranted notwithstanding a finding

that the case is exceptional (*see S.C. Johnson*, 781 F.2d at 201 (stating that even "an exceptional case does not require in all circumstances the award of attorney fees")), or whether the amount of fees and costs is reasonable.

### III. CONCLUSION

For the foregoing reasons, Dr. Barry's Motion for Enhanced Damages and Attorney's Fees (Dkt. 431) is GRANTED IN PART and DENIED IN PART. The final damages award will be enhanced by 20 percent in the court's Final Judgment. Dr. Barry's request for attorney's fees is denied in its entirety.

**So ORDERED and SIGNED** this 20 day of **April, 2017.**